UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

                    Plaintiff,

          v.

OTIS WILLIS and TIFFANY ST. DENIS,

                    Defendants.
_____

                              REPORT & RECOMMENDATION

                              13-CR-6013G

**PRELIMINARY STATEMENT**

          By Order of Hon. Frank P. Geraci, United States District Judge, dated January 17,

2013, all pretrial matters in the above captioned case have been referred to this Court pursuant to

28 U.S.C. §§ 636(b)(1)(A)-(B).  (Docket # 8).

          On October 24, 2013, the grand jury returned a three-count second superseding

indictment charging defendants Otis Willis ("Willis") and Tiffany St. Denis ("St. Denis") with

conspiracy to commit sex trafficking of minors, in violation of 18 U.S.C. § 1594(c).  (Docket

# 73).  Both defendants are also charged with substantive sex trafficking of a minor, in violation

of 18 U.S.C. §§ 1591(a)(1) and (b)(2).  In addition, St. Denis is charged with distributing cocaine

to a person under twenty-one years of age, in violation of 21 U.S.C. § 859(a).

          Currently pending before this Court are motions by Willis and St. Denis to

suppress evidence of two photographic identifications.  (Docket ## 17, 80, 116, 117).  Also

pending before the Court are St. Denis's motions to suppress evidence seized pursuant to search

warrants and to suppress statements.[1]  (Docket # 80).  For the reasons discussed below, I

recommend that the district court deny defendants' motions.


## FACTUAL BACKGROUND

I.   **Search Warrant for Samsung Cricket Phone**

On August 9, 2012, this Court issued a warrant to search a silver and black

Samsung Cricket Phone, identification number A3LSCHR261 (the "Samsung Cricket phone").

(Docket # 80-5).  Federal Bureau of Investigation ("FBI") Special Agent Barry W. Couch

("Couch") submitted an affidavit in support of the warrant application.  (*Id.* at 7-15).

Couch's affidavit recounted information he had learned through his investigation

of sex trafficking of a minor by Willis and St. Denis.  (*Id.* at ¶ 5).  Couch stated that CW1, a

friend of the victim's mother, contacted the FBI and reported that Willis and St. Denis were

involved in trafficking the victim ("CW2").  (*Id.*).  Couch interviewed CW1 on August 3, 2012.

(*Id.* at ¶ 6).  According to CW1, she and CW3 (the mother of CW2), discovered that CW2 was

staying with St. Denis at St. Denis's residence located on the corner of Eighth and Bay Streets in

Rochester, New York.  (*Id.*).  During the week of July 25, 2012, CW1, CW3 and three other

individuals went to that location and were involved in an altercation with its occupants.  (*Id.*).

After the altercation, one of the individuals who had accompanied CW1 and CW3 retrieved a

pair of glasses and a cellphone from the ground, believing that they belonged to CW1.  (*Id.*).

The cellphone retrieved from the ground was the Samsung Cricket phone.

---

[1]  Defendants filed omnibus motions seeking other forms of relief.  Specifically, Willis also sought, *inter alia*, *Brady* material, discovery and inspection, Rule 404(b) evidence, *Jencks* material, preservation of rough notes, and leave to file additional motions.  (Docket # 17).  St. Denis's omnibus motion also sought a bill of particulars, *Brady* material, discovery and inspection, evidentiary rulings under Federal Rules of Evidence 404(b), 608 and 609, joinder in co-defendant's motions, preservation of rough notes, severance of defendants, a Rule 12(b)(4) notice and leave to file additional motions.  (Docket # 80).  Each of the above-referenced motions was decided by the undersigned or resolved by the parties in open court on March 13, 2013 and December 12, 2013, respectively.  (Docket ## 32, 83).

According to CW1, the Samsung Cricket phone did not have a battery, but CW1 was able to obtain a battery for the phone.  (*Id.*).  Upon viewing the phone's contents, CW1 determined that the phone belonged to St. Denis and that it contained text messages containing "escorting" prices, photographs of Willis and St. Denis and photographs of partially-clothed teenage girls.  (*Id.*).  CW1 provided the Samsung Cricket phone to Couch.  (*Id.*).

Couch also interviewed CW3, who told him that subsequent to the altercation at St. Denis's residence, CW3 received a phone call from "Otis" stating that he wanted his phone returned.  (*Id.* at ¶ 7).  CW3 also reported that CW2 had been retrieved from St. Denis's residence and told CW3 that she had obtained drugs in exchange for being prostituted by St. Denis.  (*Id.*).

On the same day, Couch interviewed CW2, who was sixteen years old.  (*Id.* at ¶ 8).  CW2 told Couch that a woman named "Tiffany" had provided her cocaine for free for approximately four years.  (*Id.*).  According to CW2, Tiffany told CW2 approximately two or three weeks earlier that she could no longer obtain cocaine for free and would have to prostitute in exchange for cocaine, which CW2 agreed to do.  (*Id.*).

According to CW2, Tiffany posted prostitution advertisements on a website titled "Backpage.com" using a laptop computer and her cellphone.  (*Id.*).  According to Couch, he showed the Samsung Cricket phone to CW2, and she positively identified the phone as the one that Tiffany had used to post prostitution advertisements of CW2 on Backpage.com.  (*Id.*).  CW2 told Couch that she had engaged in prostitution activities with approximately five or six different men and provided the proceeds from the activities to Tiffany.  (*Id.*).

CW2 told Couch that a man named Otis also participated in prostitution activity with Tiffany.  (*Id.* at ¶ 9).  CW2 reported that on more than one occasion she had witnessed

Tiffany give money to Otis after CW2 had engaged in prostitution activities. (*Id.*). According to CW2, she had twice expressed her desire to stop engaging in prostitution activities and to return to her home. (*Id.*). CW2 stated that on both occasions Otis "beat" her, leaving bruises on her body. (*Id.*). CW2 reported that Otis had raped her and that she felt that she was being held against her will. (*Id.*).

CW2 was interviewed by Task Force Officer Brian Tucker ("Tucker") on August 8, 2012. (*Id.* at ¶ 10). During this interview, CW2 stated that her mother had not retrieved her from inside Tiffany's residence, but had picked her up from the street just before the altercation at the residence. (*Id.*). CW2 had attempted to run away from her mother, but her mother found her. (*Id.*). CW1 and CW3 approached St. Denis's residence after CW2 had been located. (*Id.*).

CW2 also stated that she had confided to CW1 the circumstances of her prostitution in exchange for drugs, and CW1 may have informed CW3. (*Id.*). According to CW2, although she had been using drugs for four years, she had been obtaining cocaine for free from Tiffany for approximately one year. (*Id.*). In addition, CW2 told Tucker that she had never actually observed Tiffany give money to Otis. (*Id.*). Finally, CW2 recounted that after the altercation at St. Denis's residence, Otis called the Samsung Cricket, spoke to CW3 and requested the return of his phone. (*Id.*).

## II.  Search Warrant for 495 Bay Street

On August 23, 2012, this Court issued a warrant to search 495 Bay Street, Rochester, New York. (Docket # 80-3). The warrant, which was issued upon an affidavit sworn by Couch, authorized the search and seizure of various items, including laptop computers, cellular telephones and records. (*Id.* at 5).

4

In addition to much of the same information that was contained in his August 9, 2012 affidavit (*compare* Docket # 80-3 *with* # 80-5), Couch's August 23, 2012 affidavit also stated that during the August 3, 2012 interview of CW2, she told him that Tiffany also participated in prostitution activities and used a black Dell laptop, in addition to the Samsung Cricket phone, to post advertisements on Backpage.com.  (Docket # 80-3 at ¶¶ 8, 10).  According to CW2, she was staying at Tiffany's residence on the corner of Bay and Eighth Streets in Rochester, New York, along with Otis, during the period that she was engaging in prostitution activities.  (*Id.* at ¶¶ 8-9).  CW2 told Couch that Otis made the decisions whether Tiffany or CW2 would be assigned to each particular prostitution client.  (*Id.* at ¶ 9).

CW2 described St. Denis's residence as a multi-dwelling residence that was either white or light gray in color.  (*Id.* at ¶¶ 8, 10).  During the August 8, 2012 interview with Tucker, CW2 stated that Tiffany's residence was on the left when facing the front of the building.  (*Id.*).  According to CW2, Tiffany previously had lived on the right side of the premises.  (*Id.* at ¶ 10).  CW2 reported that a set of stairs was located immediately inside the door to the residence and a bedroom was located on the left at the top of the stairs.  (*Id.*).

During the same interview, Tucker showed CW2 a single photograph, and CW2 identified the person depicted as Otis.  (*Id.*).  According to Couch, the photograph was of Otis B. Willis, Jr., and a search of an online database called "Accurint.com" had associated the name Otis B. Willis, Jr. with 495 Bay Street, Rochester, New York.  (*Id.*).

In his affidavit, Couch also reported that a federal search warrant for the Samsung Cricket phone had been executed on the phone.  (*Id.* at ¶ 11).  His affidavit also stated that records obtained pursuant to a subpoena served on Cricket Communications, Inc. revealed that St. Denis was the subscriber of the Samsung Cricket phone.  (*Id.*).

According to Couch, he conducted an internet search and located an advertisement on Backpage.com that had been posted on June 30, 2012.  (*Id.* at ¶ 12).  Couch stated the advertisement listed the Samsung Cricket phone number as the contact phone number and contained two photographs of a female's face.  (*Id.*).  Couch further stated that the advertisement also listed another contact phone number.  (*Id.* at ¶ 15).

On August 20, 2012, Couch showed CW2 the advertisement containing the photographs.  (*Id.* at ¶ 13).  According to Couch, CW2 identified the female depicted in the photographs as "Tiffany."  (*Id.*).  Couch also showed CW2 several photographs of 495 Bay Street, Rochester, New York, and CW2 identified the residence as the one where she had been staying with Tiffany.  (*Id.*).  On that same day, Couch conducted physical surveillance at 495 Bay Street, Rochester, New York, and identified the residence as a light gray, multi-story, two residence home, with a left side residence entrance marked with the number "495."  (*Id.* at ¶ 14).

III.     **Search Warrant for Cell Phones Seized from St. Denis on August 24, 2012**

On August 23, 2012, this Court issued warrants to search five cellphones based upon another sworn application by Couch.  (Docket # 80-6 at 2-6, 7-21).  Couch's affidavit recounted the information contained in his previous affidavits, along with some additional information.

According to Couch, on March 6, 2012, the Amherst New York Police Department ("Amherst Police") responded to a complaint of possible prostitution at a hotel located in Amherst, New York.  (*Id.* at ¶ 5).  When they arrived, the manager of the hotel informed Amherst Police that Willis and another male had checked into the hotel with two females.  (*Id.*).  After they checked in, the manager visited the Backpage.com website and

observed an advertisement depicting one of the females who had accompanied Willis to the hotel.  (*Id.*).

Amherst Police then observed an adult male arrive at the hotel in his car, enter room 201 and leave the hotel approximately thirty minutes later.  (*Id.* at ¶ 6).  The police stopped the man's car and questioned him.  (*Id.*).  The man admitted that he had paid $100 in exchange for sexual activities in hotel room 201 to a girl named "Kiesha," whom he had met by responding to an advertisement on Backpage.com.  (*Id.*).

Amherst Police then observed two males and two females exiting room 215 of the hotel.  (*Id.* at ¶ 7).  One of the males was identified as Willis, and the females were identified as St. Denis and CW4, a minor.[2]  According to the hotel manager, St. Denis was the individual depicted in the Backpage.com advertisement, and CW4 was identified as "Kiesha" by the man whose car had been stopped.  (*Id.*).

On March 11, 2012, FBI Special Agent Jennifer Amo ("Amo") interviewed CW4. (*Id.* at ¶ 8).  CW4 reported that she had first met Willis in December 2011.  (*Id.*).  CW4 told Amo that she spent time at Willis's Grand Avenue premises on several occasions.  (*Id.*).  According to CW4, Willis asked to take photographs of CW4, but she had refused.  (*Id.*).  CW4 stated that she met St. Denis while she was visiting the Grand Avenue residence.  (*Id.* at ¶ 9).  According to CW4, St. Denis was a prostitute who told CW4 that she worked for Willis.  (*Id.*).  CW4 stated that Willis and St. Denis attempted to persuade her to engage in prostitution, but she refused. (*Id.* at ¶ 8).

CW4 told Amo that she was forced to leave the Grand Avenue premises when St. Denis accused her of stealing.  (*Id.* at ¶ 9).  After she left, she repeatedly received phone calls

---

[2]  Couch's affidavit refers to this witness as CW1, but for consistency she will continue to be referred to as CW4 throughout this decision.

from Willis asking her to return.  (*Id.*).  CW4 reported that Willis invited CW4 to accompany him to Amherst, New York.  (*Id.*).  CW4 agreed, and was accompanied by Willis, St. Denis and Willis's nephew.  (*Id.*).  Willis or his nephew paid for CW4's train ticket, and they traveled to a hotel in Amherst, New York.  (*Id.*).

        According to CW4, once they arrived at the hotel, they rented two separate rooms. (*Id.* at ¶ 10).  CW4 stated that she was encouraged to allow photographs of herself to be taken, and eventually acceded.  (*Id.*).  Willis's nephew stated that CW4 would be called "Kiesha."  (*Id.* at ¶ 11).  According to CW4, St. Denis took photographs of CW4 using Willis's nephew's phone.  (*Id.*).  CW4 reported that two "customers" came to the hotel that night, one of whom was the man who was stopped by Amherst Police.  (*Id.*).  According to CW4, St. Denis told her that she needed to give her money to Willis because he had provided her a place to reside and hygiene products.  (*Id.* at ¶ 12).  According to CW4, St. Denis advertised herself online using the name "Michelle."  (*Id.*).

        According to Couch, subpoenaed records from Backpage.com included:  (1) an advertisement that had been posted on March 6, 2012, captioned "Kiesha has *JUST ARRIVED* - 19," with an associated customer name of "Tiana Santiago" and an address of "334 Grand Avenue, Rochester, New York" (*id.* at ¶ 22); (2) advertisements with the same pictures of St. Denis that had been identified by CW2, with associated customer names of "Michelle Santiago" and "Tiffany St. Denis" and addresses of "334 Grand Avenue, Rochester, New York" and "495 Bay Street, Rochester, New York" (*id.* at ¶ 23); and, (3) other advertisements containing pictures of St. Denis identified as "Tiana," which listed the Samsung Cricket phone number as the contact number and michelle.santiago83@gmail.com as a contact

email address, with an associated customer name of Tiffany St. Denis and address of 334 Grand Avenue (*id.* at ¶ 24).

According to Couch, on August 24, 2012, he and Tucker interviewed St. Denis at a motel located in Rochester, New York after she had been arrested for prostitution.  (*Id.* at ¶ 25).  St. Denis stated that she had met CW2[3] in December 2011 and identified a photograph of CW2.  (*Id.*).  St. Denis told Couch that she lived at 495 Bay Street, Rochester, New York and that she used to live at 493 Bay Street.  (*Id.*).  St. Denis admitted to having engaged in prostitution activities for the previous six months and to sometimes using the name "Michelle Santiago."  (*Id.*).

A wallet and five cellphones were seized from the motel room where St. Denis had been arrested.  (*Id.* at ¶¶ 26-27).  The wallet contained identification and debit cards with Willis's name on them, one of which had been used to pay for one of the Backpage.com advertisements.  (*Id.*).

IV.   **August 24, 2012 Interview of St. Denis**

This Court conducted an evidentiary hearing concerning the circumstances surrounding St. Denis's post-arrest statements.  (Docket ## 87-88).[4]  During the hearing, the government offered testimony from Tucker.  (Tr. A 5).

Tucker testified that he had been employed by the Rochester Police Department ("RPD") for approximately twenty-nine years and had been an investigator for approximately

---

[3]  Couch's affidavit refers to the individual as CW4, but for consistency she will be referred to as CW2 throughout this decision.

[4]  The transcript of the January 10, 2014 hearing shall be referred to as "Tr. A __," and the transcript of the January 14, 2014 hearing shall be referred to as "Tr. B __."  (Docket ## 92, 93).

twenty-five years.  (Tr. A 6).  At the time of the hearing, Tucker was assigned to the FBI Child Exploitation Task Force.  (Tr. A 5).

According to Tucker, he was involved in an investigation of St. Denis on August 24, 2012.  (Tr. A 7).  Tucker testified that he had been contacted regarding A.P., a minor who had allegedly been advertised for prostitution on the Backpage.com website.  (*Id.*).  According to Tucker, he had identified St. Denis and Willis as suspects and had determined that St. Denis had placed a prostitution advertisement depicting herself on Backpage.com.  (Tr. A 7-8).  Tucker testified that St. Denis was contacted and, acting in an undercover capacity, he arranged to meet her that day at approximately 11:00 a.m. at a motel in Rochester.  (Tr. A 8-10; Tr. B 5-6).

According to Tucker, he was accompanied to the hotel by members of the FBI task force, the RPD Narcotics Unit and the Gates Police Department.  (*Id.*).  When Tucker arrived, he contacted St. Denis, and she gave him a room number.  (*Id.*).  Tucker knocked on the hotel room door and was invited inside by St. Denis.  (Tr. A 10).  A short while later, approximately three to five officers knocked on the door to the room.  (Tr. A 10-11; Tr. B 6-7).  Tucker answered the door, and the officers entered with their guns drawn, directed St. Denis to the ground, announced that she was under arrest and took her into custody.  (*Id.*).  St. Denis was permitted to get dressed and told that the officers wanted to talk to her about a girl named A.P.  (Tr. A 11-12; Tr. B 7-8).

Tucker could not recall whether St. Denis was handcuffed.  (Tr. A 11-12; Tr. B 7-8).  According to Tucker, he sat on the edge of the bed, and Couch and St. Denis were seated at a table in the hotel room.  (Tr. A 11-12; Tr. B 10).  Tucker testified that none of the officers wore uniforms or displayed their service weapons after the arrest.  (Tr. A 12-13; Tr. B 11, 20).

According to Tucker, St. Denis did not appear to be ill, injured or under the influence of drugs or alcohol.  (Tr. A 13; Tr. B 9, 19-20).

Tucker testified that he advised St. Denis of her *Miranda* rights by utilizing an RPD notification and waiver card.  (Tr. A 14, 20; Government's Exhibit ("Gov. Ex.") 1; Tr. B 8-9).  According to Tucker, he first completed information on the front of the card, including the date, location, St. Denis's name, his own name and St. Denis's level of education.  (Tr. A 15).  Tucker then turned the card over and read the rights verbatim from the card.[5]  (Tr. A 15-16).  After reading the rights, Tucker asked St. Denis, "Do you understand what I have just said to you," and St. Denis responded, "Yes."  (*Id.*).  Tucker asked St. Denis, "With these rights in mind, do you agree to talk with me now?"  (*Id.*).  St. Denis responded affirmatively, and Tucker then began to interview her.  (Tr. A 16-17).  Tucker testified that St. Denis did not indicate that she did not understand her rights or ask any questions about them.  (Tr. A 16, 18).

Tucker interviewed St. Denis for approximately fifteen or twenty minutes.  (Tr. A 17; Tr. B 10).  During the interview, neither Tucker nor any of the other officers made any threats or promises to St. Denis to induce her to speak to Tucker.  (Tr. A 16-17).  Tucker testified that St. Denis never indicated that she wanted an attorney or to terminate the interview.  (Tr. A 17-18).  According to Tucker, St. Denis was cooperative and "open and talkative" during the interview, although she was upset that she had been arrested.  (Tr. A 18; Tr. B 9).

---

[5]  The RPD Notification and Waiver Card provided:

1. You have the right to remain silent - you do not have to say anything if you don't want to.
2. That anything you do say can be used against you in a court of law.
3. You have the right to talk to a lawyer before answering any questions and have him here with you.
4. If you can't pay for a lawyer, one will be given to you before any questioning if you wish.
5. If you do wish to talk with me, you can stop at any time.

(Gov. Ex. 1).

**V.**   **August 8, 2012 Identification Procedure**

This Court conducted an evidentiary hearing on November 5, 2013 concerning the circumstances surrounding an August 8, 2012 identification procedure.  (Docket # 79).[6]  During the hearing, the government offered testimony from Tucker and A.P.[7]  (Tr. C 4-19, 22-42).

**A.**   **Tucker's Testimony**

Tucker testified that law enforcement officials interviewed A.P. at her mother's house on August 3, 2012.  (Tr. C 23-25).  During that interview, A.P. mentioned the names "Otis" or "O," and "Tiffany."  (Tr. C 25).  Tucker testified his further investigation identified the two individuals whom A.P. had discussed as Willis and St. Denis.  (Tr. C 25-26).

On August 8, 2012, Tucker again interviewed A.P., this time at the Bivona Child Advocacy Center.  (Tr. C 23).  According to Tucker, he conducted the majority of the interview alone, although Couch and another observed the interview from an observation room; Couch participated in the last few minutes of the interview.  (Tr. C 23-24, 32).  During the interview, Tucker showed A.P. a photograph of Willis and asked her whether she recognized the person.  (Tr. C 27; Gov. Ex. 1A[8]).  According to Tucker, without delay or hesitation, A.P. immediately replied that the individual was Otis, the person she had been discussing.  (Tr. C 27-28).  A.P. told Tucker that she had encountered Otis on several different occasions.  (*Id.*).  A.P. placed her initials and the date and time next to the photograph.  (Tr. 29; Gov. Ex. 1A).

According to Tucker, he had not told A.P. in advance that he would be showing her a photograph of Willis.  (Tr. C 42-43).  According to Tucker, A.P. appeared young, but was

---

[6]  The transcript of the November 5, 2013 hearing shall be referred to as "Tr. C __."  (Docket # 85).

[7]  After reviewing and comparing the hearing testimony with the factual assertions contained in Couch's affidavits, it is apparent that CW2 and A.P. are the same individual.

[8]  During the hearing, this exhibit was admitted as Government's Exhibit 1.  (Tr. C at 27).  During another hearing in this case, a different exhibit was admitted as Government's Exhibit 1.  (Tr. A at 15).  To avoid confusion, the exhibit admitted during the November 5, 2013 hearing will be referred to herein as "Government's Exhibit 1A."

able to describe with "good knowledge" several of the events that had transpired.  (Tr. C 30).

Based upon his training and experience, Tucker did not believe that A.P. was under the influence

of alcohol or drugs during the interview.  (Tr. C 30-31, 34-35).  Further, A.P. was residing in a

controlled environment at the time of the interview, and Tucker did not believe that she would

have had the opportunity to consume alcohol or drugs.  (Tr. C 34-35).

      The document that Tucker used during the identification procedure contained a

single photograph of a black male, next to which was printed the names "Otis B. Willis" and

"Otis B. Willis Jr.," a date of birth of May 3, 1982 and a location of birth as New York.  (Gov.

Ex. 1A).  An arrest date of December 1, 2011 appears underneath the photograph, along with the

addresses of 78 Otis Street, Rochester, New York, 311 Forester Street, Rochester, New York and

311 Mill Road, Greece, New York.  (*Id.*).  Tucker testified that this information was on the

document when he showed it to A.P.  (Tr. C 38, 42-43).

      Tucker characterized the identification as a "confirmatory" identification

procedure.  (Tr. C 29).  According to Tucker, he believed that it was acceptable to display a

single photograph of a suspect when the witness is being asked to identify a family member, or

person with whom they lived or had sexual relations.  (*Id.*).

      According to Tucker, A.P. had told him that she had known St. Denis for some

time and had lived with both St. Denis and Willis at 495 Bay Street for approximately four or

five days.  (Tr. C at 37).  Tucker testified that A.P. also told him that she had had two sexual

encounters with Willis.  (Tr. C at 37-38).  According to Tucker, A.P. had told him that she had

been using drugs for approximately four years and was unable to recall certain information

because she had been using drugs.  (Tr. C 37, 39).  Tucker opined that there were times when

A.P. told him that she did not recall certain events, although Tucker believed that she did but wanted to avoid talking about them.  (Tr. C 36).

Tucker also testified concerning his interviews with A.P. during an evidentiary hearing that was conducted on January 14, 2014.[9]  Tucker testified that during one of the interviews, A.P. provided him with a brief description of the interior of St. Denis's residence at 495 Bay Street, Rochester, New York.  (Tr. B at 11-13).  In a subsequent interview, A.P. told him that she had lived at St. Denis's residence for a few days.  (Tr. B at 13-14).  Tucker again asked A.P. to describe the interior of St. Denis's residence, which she did.  (*Id.*).  Tucker testified that her description was inconsistent with the observations made by law enforcement agents when they executed the warrant there.  (Tr. B 14-15).  According to Tucker, A.P.'s description of a bed and a television located in the bedroom differed from law enforcement's observations. (*Id.*).  In addition, A.P. had told Tucker that she had slept on a mattress in the attic, although no mattress was located in the attic when the warrant was executed.  (Tr. B 15).

Tucker testified that he believed that when A.P. either did not want to answer or was uncertain of the answer to certain questions during his interviews of her, she responded that she could not recall and blamed her inability to recall on her drug use.  (Tr. B 16).  Tucker reaffirmed his prior testimony that he believed that she sometimes recalled information despite her assertions to the contrary.  (Tr. B 17-18).

### B.   A.P.'s Testimony

A.P. testified that she spoke with Tucker on August 8, 2012 at the Bivona Child Advocacy Center.  (Tr. C 3-4).  A.P. testified that she had met a man named "Otis" or "O" when she was living with Tiffany.  (Tr. C 5-6).  According to A.P., Otis had had a sex with her during

---

[9]  As noted above, the transcript of the January 14, 2014 hearing shall be referred to as "Tr. B __." (Docket # 93).

that time period.  (Tr. C 6).  Also during that time period, A.P. testified that she was using drugs, including cocaine, marijuana and pills.  (*Id.*).

During her testimony, A.P. identified the picture of Willis that Tucker had shown her on August 8, 2012 and testified that she had placed her initials next to the picture.  (Tr. C 6-8, 16-17).  According to A.P., Tucker handed her the photograph and asked her whether she knew the person depicted.  (Tr. C 11, 16-17).  A.P. responded affirmatively.  (*Id.*).  A.P. testified that at the time of her identification, she did not have any doubts that Willis was depicted in the photograph and that she did not lie when she told Tucker that the person in the photograph was Willis.  (Tr. C 12).

A.P. testified that she previously had offered perjured testimony.  (Tr. C 12-14).  According to A.P., she previously gave false testimony because she was "high" on drugs and is unable to remember incidents or information when she is high.  (Tr. C 14-15).  According to A.P., she sometimes "black[s] out" as a result of drug consumption.  (Tr. C 18).  At the time of the hearing, A.P. testified that she had not used drugs for approximately two months.  (Tr. C 17).

A.P. testified that she did not recall offering testimony during a trial on November 19, 2012, but did recall meeting with Tucker and identifying the photograph of Willis and placing her initials on the document.  (Tr. C 14-16).  A.P. testified that before displaying the photograph, Tucker told her that he would be showing her a picture of Willis.  (Tr. C 16).

## VI.    Identification Procedure

This Court conducted an evidentiary hearing concerning the circumstances surrounding an identification procedure conducted on August 20, 2012.  (Docket ## 87, 106).[10]

---

[10]  As noted above, the transcript of the January 10, 2014 hearing shall be referred to as "Tr. A __." (Docket # 92).  The transcript of the May 16, 2014 hearing shall be referred to as "Tr. D__."  (Docket # 107).

During the hearing, the government offered testimony from Couch and A.P.  (Tr. A 26-58; Tr. D 15-49).

### A.   __Couch's Testimony__

Couch testified that he had been employed as a Special Agent with the FBI for approximately five years.  (Tr. A 26).  According to Couch, in August 2012 he was involved in the investigation of allegations made by A.P.  (Tr. A 27).  Couch testified that A.P. had told investigators that she had been prostituted by Otis and Tiffany, whose last names she could not provide, through advertisements placed on Backpage.com.  (Tr. A 27-28).  She did provide physical descriptions of the individuals.  (*Id.*).  According to Couch, A.P. described Tiffany as a female in her early to mid-twenties with a mixed complexion that was darker than A.P.'s complexion.  (*Id.*).

Couch was given a cellphone that A.P. identified as belonging to St. Denis.  (Tr. A 28).  According to Couch, the investigative team performed an internet search using the phone number associated with the cellphone in an attempt to identify any recently-posted prostitution advertisements associated with that phone number.  (Tr. A 28-29).  Couch testified that the search located a prostitution advertisement posted to Backpage.com on June 30, 2012, which contained photographs of an individual who appeared to match the description of Tiffany provided by A.P.  (Tr. A 29-32).  The advertisement did not reflect the name Tiffany St. Denis.  (Tr. A 32).  Couch testified that he believed he searched for photographs of St. Denis, but was unable to find any others.  (Tr. A 33).

According to Couch, A.P. told him that she had known St. Denis for approximately four years and that St. Denis had provided her with cocaine and other drugs.  (Tr. A 34, 41-43).  Couch testified that during a subsequent interview A.P. stated that she had

known Tiffany for only about one year.  (Tr. A 48).  Couch testified that A.P. told him that she

had lived at St. Denis's residence for a few weeks and was able to describe the location.  (Tr. A

34-35, 49-51).  According to Couch, he recalled that after a search warrant was executed at

St. Denis's residence, he and Tucker interviewed A.P. again about her description of the interior

of the residence.  (Tr. A 49).  Couch also testified that A.P. told investigators during one

interview that she had witnessed St. Denis giving money to Willis after engaging in prostitution

activities and that St. Denis had told her that she had given all her money to Willis.  (Tr. A 52).

According to Couch, A.P. clarified in a subsequent interview that she had never observed

St. Denis give Willis money.  (Tr. A 52-53).

On August 20, 2012, Couch, accompanied by Special Agent Curt Brazelton

("Brazelton"), met with A.P. at her residence.  (Tr. A 35, 54).  According to Couch, the purpose

of the meeting was to determine whether A.P. could identify the individual depicted in the

Backpage.com advertisement.  (*Id.*).  Couch showed A.P. the Backpage.com advertisement,

although he could not recall what he said to her when he showed her the document.  (Tr. A

36-37, 54).  Couch recalls that A.P. immediately communicated that the person depicted in the

advertisement was the "Tiffany" whom she had discussed during prior interviews, although he

was unable to recall A.P.'s exact words.  (Tr. A 37-38, 56-57).  Couch testified that A.P. did not

express any reservations about her identification.  (Tr. 38-39).

The advertisement that Couch displayed contained four photographs and some

textual material.  (Gov. Ex. 2).  Two of the photographs depict the face of the same female; the

other two pictures do not show faces.  (*Id.*).  The textual information includes the name

"Michelle," identifies the advertiser's age as twenty-two and includes two contact phone

numbers.  (*Id.*).  One of those phone numbers, which is highlighted on the advertisement, is the

phone number associated with the Samsung Cricket phone.  (*Id.*; Tr. A 28-30; Docket # 80-3 at ¶ 11).

    **B.**    **A.P.'s Testimony**

        A.P. testified that she was born in November 27, 1995.  (Tr. D 15, 20).  According to A.P., on August 20, 2012, she met with Couch to discuss a person named Tiffany.  (*Id.*).  A.P. testified that at that time she knew only one person with that name.  (Tr. D 15-16).  A.P. lived with Tiffany at a residence located on the corner of Bay and Eighth Streets in Rochester, New York.  (Tr. D 16-17).  While she lived there, A.P. testified, she would spend time with Tiffany and was using cocaine.  (Tr. D 17).

        A.P. testified that Couch showed her the advertisement with the photographs and asked her whether she could identify the individual depicted.  (Tr. D 18, 45-46).  According to A.P., she promptly identified the individual as "Tiffany."  (Tr. D 18-19, 45-46).  A.P. testified that Couch did not make any threats or promises to induce her identification.  (*Id.*).  According to A.P., she had spent time with Tiffany and knew Tiffany.  (Tr. D 45-46).  A.P. also testified that she previously had given false identification testimony resulting in the person's arrest.  (Tr. D 19, 26-27).  According to A.P., she was unable to recall why she had provided the false identification.  (Tr. D. 26-27).

        On cross-examination, A.P. was asked whether she recalled previously testifying in a state court criminal prosecution on November 19, 2012 that her birth date was November 26, 1995.  (Tr. D 20-21).  A.P. testified that she recalled providing testimony, but that she had not testified that her birth date was November 26.  (Tr. D 21).  According to A.P., if she had provided such testimony, it would have been incorrect.  (Tr. D. 21-22).  A.P. testified that she has lied about her age in the past, but has never provided a false date of birth or lied to the police

about her age.  (Tr. D 22).  A.P. admitted that she has been running away from her home since

she was twelve, but disagreed that she left home in order to use drugs.  (Tr. D 23-24).  When

confronted with her previous testimony from the state court proceeding in which she testified

that she had run away from home in order to use drugs, A.P. testified that she could not

remember giving such testimony.  (Tr. D 24-25).  When examined about the incident giving rise

to the false identification, A.P. testified that she was unable to recall any details other than

identifying the last person whom she had been with that evening prior to "black[ing] out."

(Tr. D 28).

        A.P. admitted that she used cocaine during the period of time that she lived with

St. Denis, but denied using marijuana, crack cocaine, vicodin or ecstasy during that period.

(Tr. D 25).  She also denied engaging in sexual activity with Willis in exchange for marijuana

and denied telling law enforcement that she had.  (Tr. D 26-28).  A.P. denied that she blacked out

often when using drugs, but agreed that she has "blacked out" on occasion rendering her unable

to recall things that have happened.  (Tr. D 28-29).  When testifying before the grand jury, A.P.

testified that because of her drug use she was unable to "remember half of the stuff that

happened to [her]."  (Tr. D 29).  A.P. stated that she did not recall testifying in the grand jury

about her impaired recollection due to drug use.  (*Id.*).

        A.P. was asked whether she remembered a confrontation between her mother and

St. Denis in July 2012.  (Tr. D at 30-31).  A.P. testified that although she remembered that a

confrontation had occurred, she could not remember any details about the incident.  (*Id.*).  A.P.

denied providing details of the incident to law enforcement officials.  (*Id.*).  According to A.P.,

she could not recall anything that had happened that day prior to the confrontation, including

what she was wearing.  (Tr. D 31-33).  A.P. later testified that she had been wearing khaki shorts

and a red tank top.  (Tr. D 33-34).  She testified that she could not recall whether she had seen

Willis that day and could not recall whether she had told officers that Willis had raped her that

day.  (Tr. D 31-33).  Similarly, she did not recall telling officers that she had gone to a medical

provider and denied that she had in fact done so.  (Tr. D 32-33).

        A.P. testified that after the confrontation she returned to the residence at Bay and

Eighth Streets.  (Tr. D. 34-35).  According to A.P., she could not recall how long she had lived

there, nor could she recall when she first met St. Denis.  (Tr. D. 35-36).  She also testified that

she did not remember telling law enforcement that she had known St. Denis for four years,

although she subsequently testified that she did not make such a statement to law enforcement.

(*Id.*).  She later testified that she had not known Tiffany before the summer of 2012 and could

not recall how many times she had interacted with Tiffany during the summer of 2012.  (Tr. D

43).

        A.P. eventually testified that on the day of the confrontation, her mother had

observed her and Tiffany walking down the street in matching outfits of tan shorts and red shirts.

(Tr. D 47).  According to A.P., her mother was upset and took A.P. back to her house.  (*Id.*).

After arriving at her mother's house, A.P. described her situation to her mother, who,

accompanied by A.P. and A.P.'s aunt, went to St. Denis's premises and got into an altercation

with St. Denis.  (*Id.*).  Specifically, A.P. testified that her mother "kick[ed] down" St. Denis's

door and had a physical altercation with St. Denis.  (*Id.*).  According to A.P., she was arrested on

an outstanding warrant after the confrontation and did not return to St. Denis's residence.  (Tr. D

48).

        A.P. claimed not to recall describing St. Denis's premises to law enforcement

agents and did not recall being questioned about the accuracy of her description after the warrant

was executed.  (Tr. D 36-37).  A.P. testified that she did not remember telling the officers that her drug use prevented her from recalling the interior of 495 Bay Street.  (Tr. D 37).  According to A.P., her drug use has not affected her memory, although she testified she could not recall the interior of 495 Bay Street.  (*Id.*).

A.P. admitted that she was using drugs during the summer of 2012, but denied "heavy" use during that period.  (Tr. D 38).  According to A.P., she used cocaine and ecstasy, but denied using vicodin, marijuana and crack; she variously characterized the frequency of her drug use during that summer as "half of the time," "once in a while," "once a week," and "once in a blue moon".  (Tr. D 38-39, 43-44).  A.P. testified that she could not remember where she obtained her drugs.  (Tr. D 39).  A.P. later admitted that she obtained them from Tiffany, although she was unable to recall how often Tiffany supplied drugs for free.  (Tr. D 44-45).  A.P. testified that she had not used marijuana or crack cocaine since completing a rehabilitation program in 2009.  (Tr. D 38-39).  A.P. testified that the use of cocaine and ecstasy does not affect her memory.  (*Id.*).

A.P. claimed not to remember her November 2012 testimony in state court that she had run away from home in order to use drugs, including marijuana, alcohol and crack.  (Tr. D 40-41).  A.P. also claimed not to recall possessing crack cocaine in September 2011.  (Tr. D 41).  A.P. denied "blacking out" numerous times and could not recall testifying to frequent incidents of blacking out.  (Tr. D 42-43).

## VII.   A.P.'s State Court Testimony

On November 19, 2012, A.P. testified in an unrelated criminal trial in state court.[11]  A.P. testified that she was born on November 26, 1995.  (Tr. E 2).  She testified that in September 2011 she ran away from her home in order to use drugs, including cocaine, marijuana, alcohol, crack, ecstasy and vicodin.  (Tr. E 5, 16).  According to A.P., she would often lie about her age and identity in order to avoid detection.  (Tr. E 24).  A.P. stayed with friends in Rochester, New York.  (Tr. E 6-7).  At the time, according to A.P., she was "heavily" using several drugs.  (Tr. E 23).  For instance, on September 19, 2011, A.P. consumed cocaine, marijuana, crack, vicodin and ecstasy.  (Tr. E 24-25).

A.P. testified that there were nights that she could not remember.  (*Id.*).  According to A.P., she would "black[] out" in the evening and would awake the following morning and begin using drugs again.  (Tr. E 25).  A.P. testified that she had blacked out on numerous occasions prior to September 2011.  (Tr. E 26).  A.P. testified that she experienced impaired memory and judgment when she consumed drugs.  (Tr. E 26-27).

A.P. also testified that she previously had provided a sworn statement to law enforcement officers falsely identifying an individual as a perpetrator of a crime against her. (Tr. E 44-47, 51).  According to A.P., in March 2010, she attended a party and consumed ecstasy, cocaine, vicodin, alcohol and marijuana.  (Tr. E 44-45).  A.P. testified that she "blacked out" that night.  (*Id.*).  A.P. accused an individual of committing a crime against her.  According to A.P., the individual that she identified did not commit the crime, but was the last person she recalled seeing before she blacked out.  (Tr. E 44-47).  A.P. also testified that in October 2011

---

[11]   The transcript of the November 19, 2012 state court proceedings shall be referred to as "Tr. E __." (Defendant's Exhibit ("Def. Ex.") 1).  The transcript was offered and received into evidence during the November 5, 2013 evidentiary hearing.  (Tr. C 20-21).

she was approached by police officers who asked her to identify herself.  (Tr. E 47-48).

According to A.P., she lied to the officers about her identity.  (Tr. E 48).


**VIII.   St. Denis's Affidavit**

   In support of her suppression motion, St. Denis submitted an affidavit stating that she had an expectation of privacy in the premises located at 495 Bay Street, Rochester, New York, the Samsung Cricket phone and the other cellphones for which search warrants had been issued.  (Docket # 80-4 at ¶¶ 3-6).  In addition, St. Denis asserts that she was in custody when she provided statements to law enforcement in August 2012.  (*Id.* at ¶¶ 9-10).  St. Denis contends that at the time she made her post-arrest statements, she "was scared by threats of a long prison term" and did not understand or knowingly waive her rights.  (*Id.* at ¶ 10).


**REPORT & RECOMMENDATION**

**I.   Validity of Search Warrant for 495 Bay Street**

   First, I address St. Denis's challenge to the August 23, 2012 search warrant for 495 Bay Street on the grounds that the application failed to establish probable cause, that the information contained in the warrant was stale and that the warrant was overbroad.  (Docket # 80 at 26-29).

  **A.   Probable Cause**

   The Fourth Amendment to the Constitution provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. Const. amend. IV; *see also* Fed. R. Crim. P. 41.  In *Illinois v. Gates*, 462 U.S. 213 (1983), the Supreme Court affirmed the

"totality of the circumstances" test to determine whether a search warrant satisfies the Fourth Amendment's probable cause requirement. According to the Court, the issuing judicial officer must "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. at 238. A reviewing court's obligation is merely to determine that the issuing judge had a "'substantial basis for...conclud[ing]' that probable cause existed." *United States v. Smith*, 9 F.3d 1007, 1012 (2d Cir. 1993) (quoting *Gates*, 462 U.S. at 238-39) (internal quotation omitted); *Walczyk v. Rio*, 496 F.3d 139, 157 (2d Cir. 2007) ("a reviewing court must accord considerable deference to the probable cause determination of the issuing magistrate"). Moreover, "resolution of doubtful or marginal cases should be largely determined by the preference to be afforded to warrants." *United States v. Smith*, 9 F.3d at 1012 (citing *Jones v. United States*, 362 U.S. 257, 270 (1960)).

St. Denis argues that Couch's affidavit in support of the warrant application fails to establish a sufficient nexus between the alleged criminal activity and St. Denis's residence. (Docket # 80 at 27). According to St. Denis, the affidavit suggests that the criminal activity – the acts of prostitution – occurred away from the premises at various hotels or the residences of the prostitution clients. (*Id.*). St. Denis thus argues that no basis exists to conclude that evidence of criminal activity would be found in her residence.

The flaw in St. Denis's argument is that it mischaracterizes the nature of the criminal conduct at issue as prostitution, rather than sex trafficking of minors and distribution of narcotics to an underage individual. Couch's affidavit described information provided by a confidential source who was a minor and allegedly lived at the residence. According to the

source, St. Denis posted advertisements seeking to prostitute the source using a cellular telephone and laptop inside her apartment.  According to the affidavit, the source indicated that the laptop was located in the residence.  These assertions provided sufficient probable cause to believe that evidence of sex trafficking activities, including the laptop, would be found in St. Denis's residence.  *See United States v. Morgan*, 690 F. Supp. 2d 274, 284, 287 (S.D.N.Y. 2010) ("a showing of a sufficient nexus between the alleged criminal activities and the premises to be searched does not require direct evidence and may be based on reasonable inference from the facts presented based on common sense and experience[;] . . . [the] [c]ourt is entitled to rely on . . . the commonsense notion that an individual engaged in a conspiracy may have evidence of that conspiracy . . . located in his residence[;]. . . the argument that the [defendant's residence] was not linked to specific criminal activity is irrelevant") (internal quotation omitted).  Thus, I conclude that Couch's affidavit adequately establishes probable cause for the warrant.

   In any event, nothing in the record suggests that the searching officers did not rely upon the search warrant in good faith.  In *United States v. Leon*, 468 U.S. 897 (1984), the Supreme Court held that the Fourth Amendment exclusionary rule should not be applied to evidence obtained by a police officer whose reliance on a search warrant issued by a neutral magistrate was based on "objective good faith," even though the warrant itself might ultimately be found to be defective.  *Id.* at 918-23; *United States v. Salameh*, 152 F.3d 88, 114 (2d Cir. 1998), *cert. denied*, 525 U.S. 1112 (1999); *United States v. Benedict*, 104 F. Supp. 2d 175, 182 (W.D.N.Y. 2000).  The rationale underlying this good-faith exception is that the exclusionary rule "cannot be expected, and should not be applied, to deter objectively reasonable law enforcement activity."  *United States v. Leon*, 468 U.S. at 919.  The warrant here was not so facially deficient or so lacking in probable cause that reliance upon it would have been

objectively unreasonable.  *See Leon*, 468 U.S. at 923; *United States v. Cancelmo*, 64 F.3d 804, 807 (2d Cir. 1995) (citations omitted).

    **B.**    **Staleness**

        St. Denis argues that the information contained in Couch's affidavit was too stale to support a finding of probable cause that the laptop described by CW2 would be located within St. Denis's residence.  (Docket # 80 at ¶ 28).  According to St. Denis, the affidavit establishes that CW2 was last inside 495 Bay Street at the end of July 2012, and thus no evidence exists to suggest that the laptop was there approximately one month later, when the warrant was issued. (*Id.* ).

        "In determining whether probable cause exists, the magistrate is required to assess whether the information adduced in the application appears to be current, *i.e.*, true at the time of the application, or whether instead it has become stale."  *Rivera v. United States*, 928 F.2d 592, 602 (2d Cir. 1991).  "The doctrine of staleness applies when information proffered in support of a warrant application is so old that it casts doubt on whether the fruits or evidence of a crime will still be found at a particular location."  *United States v. Lamb*, 945 F. Supp. 441, 459 (N.D.N.Y. 1996).  "While there is no bright line rule for staleness, the facts in an affidavit supporting a search warrant must be sufficiently close in time to the issuance of the warrant and the subsequent search conducted so that probable cause can be said to exist as of the time of the search and not simply as of some time in the past."  *United States v. Wagner*, 989 F.2d 69, 75 (2d Cir. 1993).  Accordingly, "[t]he information offered in support of the application for a search warrant is not stale if 'there is sufficient basis to believe, based on a continuing pattern or other good reasons, that the items to be seized are still on the premises.'"  *United States v. Lacy*, 119

F.3d 742, 745-46 (9th Cir. 1997) (quoting *United States v. Gann*, 732 F.2d 714, 722 (9th Cir.),

*cert. denied*, 469 U.S. 1034 (1984)), *cert. denied*, 523 U.S. 1101 (1998).

"[T]he principal factors in assessing whether or not the supporting facts have

become stale are the age of those facts and the nature of the conduct alleged to have violated the

law." *United States v. Diaz*, 176 F.3d 52, 109 (2d Cir.) (internal citations and quotations

omitted), *cert. denied*, 528 U.S. 875 (1999); *United States v. Lamb*, 945 F. Supp. at 460.  "Some

types of evidence are more likely to remain in one location than other types of evidence." *United

States v. Patt*, 2008 WL 2915433, *12 (W.D.N.Y. 2008).  In addition, "[w]here the criminal

activity is suspected to be ongoing, 'the passage of time between the last described act and the

presentation of the application becomes less significant.'" *United States v. Gayle*, 2009 WL

4667093, *3 (S.D.N.Y. 2009) (quoting *United States v. Gallo*, 863 F.2d 185, 192 (2d Cir. 1988),

*cert. denied*, 489 U.S. 1083 (1989)).  Accordingly, "[t]he age of the information is relevant only

insofar as it affects the likelihood that evidence will be found at the premises." *See United States

v. Zoernack*, 2005 WL 1837962, *2 (S.D.N.Y. 2005).

Considering the nature of the evidence sought in this matter – laptop computers –

and the nature of the conduct under investigation – sex trafficking of a minor on multiple

occasions through the use of advertisements on an internet website – I find that Couch's affidavit

provided a sufficient basis to believe that computers containing evidence of trafficking activity

would be found in St. Denis's residence at the time the warrant was executed. *See United States

v. LaMorte*, 744 F. Supp. 573, 576 (S.D.N.Y. 1990) (probable cause established where the items

to be seized "were not temporary in nature or likely to dissipate over the intervening time").

Couch's affidavit established that St. Denis was known to possess a laptop computer that she

used to post advertisements for prostitution services involving a minor.  The affidavit further

established that less than one month prior to the warrant application, St. Denis had and used a laptop in her residence.  These factual assertions, in my estimation, establish probable cause to believe that at the time the warrant issued laptop computers containing evidence of sex trafficking of minors would be found in St. Denis's residence.

C.    **Overbreadth**

"Law enforcement agents are . . . barred from executing warrants that purport to authorize 'a general, exploratory rummaging in a person's belongings.'"  *United States v. Zemlyansky*, 945 F. Supp. 2d 438, 452 (S.D.N.Y. 2013) (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971)).  "By limiting the authorization to search to the specific areas and things for which there is probable cause to search, the [particularity] requirement ensures that the search will be carefully tailored to its justifications, and will not take on the character of the wide-ranging exploratory searches the Framers intended to prohibit."  *Maryland v. Garrison*, 480 U.S. 79, 84 (1987).  The requirement of particularity is satisfied where the warrant (1) identifies "the specific offense for which the police have established probable cause"; (2) describes the place to be searched; and, (3) specifies "the items to be seized by their relation to designated crimes."  *United States v. Galpin*, 720 F.3d 436, 445-46 (2d Cir. 2013) (internal quotation omitted).

In this case, St. Denis argues that the warrant was unconstitutionally overbroad because it permitted the seizure of any and all cellular phones and laptop computers in her residence.  (Docket # 80 at 28-29).  According to St. Denis, Couch's affidavit may have implicated the Samsung Cricket phone, but did not provide any basis to seize any other cellular telephones.  (*Id.*).  Although Couch's affidavit alleged that St. Denis used at least one other cellular phone to facilitate prostitution activities, St. Denis argues that the affidavit does not

establish a nexus between other phones and sex trafficking of minors.  (*Id.*).  Finally, St. Denis contends that the warrant improperly authorized officers to seize any and all laptops located within the residence, not just the black Dell laptop described by CW2.  (*Id.*).

St. Denis's overbreadth argument minimizes the significance of the evidence that St. Denis and Willis used several devices to facilitate the criminal activities under investigation (at least two cellphones and a laptop) and ignores altogether the limitations set forth in the warrant with respect to the search of such items.  Specifically, the warrant authorized the search of such items for information "related to recruiting, enticing, harboring, transporting, providing and obtaining a person that has not attained the age of 18 years and will be caused to engage in a commercial sex act."  (Docket # 80-3 at 5).  As Couch's affidavit established, an on-site search for electronic media during the course of a warrant execution is often not feasible because such searches entail "highly technical process[es]."  (*Id.* at 15, ¶ 16).  In this case, the warrant authorized the seizure of laptop computers and cellular telephones and required the use of a particular protocol in searching for evidence of sex trafficking of minors.  (*Id.* at 6). Accordingly, I find that the warrant provided adequate guidance limiting the scope of the search for evidence of a specific crime and was not overbroad.  *See United States v. Reed*, 2013 WL 5503691, *4 (D. Vt. 2013) (rejecting argument that "warrant was overbroad because it authorized seizure of any cell phone found in the apartment without any proof that the phone was used to commit a crime"; warrant was not overbroad because it "describe[d] specific types of evidence to be seized, limited by the items' relation to a specific crime").

For all of the reasons explained above, it is my recommendation that St. Denis's motion to suppress evidence seized from 495 Bay Street be denied.

II.    **Validity of Search Warrant for Samsung Cricket Phone**

St. Denis challenges the validity of the search warrant authorizing the search of the Samsung Cricket phone on the grounds that the supporting application failed to establish probable cause.  (Docket # 80 at ¶¶ 29-31).  St. Denis also contends that Couch improperly relied upon information provided by CW2, whose credibility was known by agents to be dubious considering their need to meet with CW2 a second time to "clarify" information she had previously provided.

As an initial matter, I reject St. Denis's contention that the warrant is infirm because the application did not disclose CW2's "untruthfulness."  (*Id.* at 31).  First, St. Denis has not identified information undermining CW2's credibility that was known to Couch or other investigating agents at the time of the warrant application and not disclosed to the issuing judge. In fact, the affidavit discloses several statements made by CW2 in a subsequent interview that differed in some respects from statements she had previously made.  (*See* Docket # 80-5 at ¶ 10). St. Denis has not identified other potentially conflicting, let alone false, undisclosed statements made by CW2 that were known or should have been known by the agents at the time the warrant issued.

I further reject St. Denis's conclusory contention that the warrant lacked probable cause.  I easily find that the information contained in Couch's affidavit provided sufficient probable cause to believe that evidence of trafficking of a minor would be found on the Samsung Cricket phone.  According to Couch's affidavit, CW2, the alleged victim, recognized the Samsung Cricket phone and informed Couch that the phone belonged to St. Denis and that St. Denis had used the phone to access the Backpage.com website in connection with prostituting CW2.  (*Id.* at ¶ 8).

Equally unavailing is any argument that Couch's affidavit is insufficient because it failed to establish CW2's veracity. "The core question in assessing probable cause based upon information supplied by an informant is whether the information is reliable." *United States v. Wagner*, 989 F.2d at 72. An informant's reliability can be assessed based upon the informant's "track record of providing reliable information" or if the information provided by the informant is independently corroborated. *Id.* at 72-73. Thus, in evaluating whether a warrant is supported by probable cause, "the court may consider whether the information an informant provides is corroborated by independent police investigation." *United States v. Pray*, 2014 WL 3534010, *7 (W.D.N.Y.) (citing *United States v. Canfield*, 212 F.3d 713, 719-20 (2d Cir. 2000)), *report and recommendation adopted*, 2014 WL 4370483 (W.D.N.Y. 2014).

Here, Couch's affidavit establishes that the information provided by CW2 was corroborated by information provided by both CW1 and CW3. CW1 and CW3 informed Couch that the Samsung Cricket phone was obtained after a confrontation involving CW1, CW3 and St. Denis that occurred outside of St. Denis's residence. (Docket # 80-5 at ¶¶ 6-7). In addition, CW1 told Couch that the Samsung Cricket phone contained photographs of St. Denis and Willis, text messages containing "escorting" prices and photographs of partially-clothed teenagers. (*Id.* at ¶ 6). According to CW3, after the phone was obtained, she received a phone call from Willis requesting the return of his phone. (*Id.* at ¶ 7). Taken together, these statements corroborate CW2's statements that the Samsung Cricket phone belonged to St. Denis and that the phone was used in connection with prostitution activities involving minors. *See United States v. Russell*, 2009 WL 466515, *5 (N.D.N.Y. 2009) (information provided by one confidential informant was corroborated by the other informant "and thus, was credible and reliable"); *United States v. Hulburt*, 2007 WL 3015218, *5 (W.D.N.Y. 2007) (probable cause to support warrant where

investigator's affidavit contained statements from an informant to an investigator that were corroborated by the alleged victim); *United States v. Harding*, 273 F. Supp. 2d 411, 418 (S.D.N.Y. 2003) ("[i]nformation provided by a crime victim or other citizen witness may be accepted even absent a proven track record of reliability or corroboration").

In any event, St. Denis has failed to offer any evidence to suggest that the searching officers did not rely upon the warrant in good faith.  *See Leon*, 468 U.S. at 897.  No credible evidence exists that the issuing judge was knowingly misled or wholly abandoned her judicial role.  *See Leon*, 468 U.S. at 923.  Nor was the warrant so facially deficient or so lacking in probable cause that reliance upon it would have been unreasonable.  *See id.*  Accordingly, I recommend that St. Denis's motion to suppress evidence seized from the Samsung Cricket phone be denied.

III.  <u>**Validity of Search Warrant for Cellular Telephones Seized Incident to St. Denis's Arrest**</u>

St. Denis also challenges the validity of the search warrants authorizing the search of the five cell phones seized at the time of her arrest on August 24, 2012.  (Docket # 80 at 31-33).  According to St. Denis, the warrants are invalid because they were not supported by probable cause and were issued approximately six months after the phones were seized.

I find that Couch's affidavit submitted in support of the warrant application provided sufficient probable cause to believe that they contained evidence of sex trafficking of a minor.  According to Couch's affidavit, St. Denis was suspected to be involved in the trafficking of two minors using the Backpage.com website.  According to Couch, CW2 told him that St. Denis had used the Samsung Cricket phone to post advertisements to Backpage.com.  Couch further stated that the five cellular phones were seized from St. Denis's hotel room on August 24,

32

2012, following St. Denis's arrest for prostitution in that hotel room.  Taken together, the information provided by Couch provides probable cause to believe that the phones that St. Denis had in her possession when she was arrested contained evidence of trafficking activity involving minors.

In any event, St. Denis has failed to offer any evidence to suggest that the searching officers did not rely upon the warrant in good faith.  *See Leon*, 468 U.S. at 897.  No credible evidence exists that the issuing judge was knowingly misled or wholly abandoned her judicial role.  *See Leon*, 468 U.S. at 923.  Nor was the warrant so facially deficient or so lacking in probable cause that reliance upon it would have been unreasonable.  *See id.*  Accordingly, I recommend that St. Denis's probable cause challenge to the warrant for the five cellular phones be rejected.

St. Denis also seeks suppression on the grounds that the government unduly delayed in seeking a warrant to search the phones and thus violated her constitutional possessory interests in the phones.  (Docket # 80 at 33).  The government counters, without citing any supporting authority, that the cell phones were properly seized incident to St. Denis's arrest and held as instrumentalities of a crime.  (Docket # 81 at 15).

Although law enforcement is permitted to "seize personal effects discovered during a search incident to arrest if the officers find that [the effects] are evidence of criminal conduct, even if unrelated to that for which a suspect had been arrested," *United States v. Herron*, 2014 WL 1698905, *7 (E.D.N.Y. 2014), the government has not provided any authority for its position that the cell phones could be held for six months without a warrant, nor addressed the caselaw cited by St. Denis.  *See United States v. Mitchell*, 565 F.3d 1347, 1350-51 (11th Cir. 2009) (citing *United States v. Jacobsen*, 466 U.S. 109, 114 (1984) and *United States v. Martin*,

157 F.3d 46, 53-54 (2d Cir. 1998)); *see also United States v. Howe*, 545 F. App'x 64, 65 (2d Cir.

2013) (in evaluating whether the government reasonably delayed in seeking a warrant, "a court

looks to various factors, including the length of time for which the individual was deprived of

her or his property, any diminished interest in the property that the individual may have had, and

whether the seizure affected the individual's liberty interests"); *see United States v. Laist*, 702

F.3d 608, 613-14 (11th Cir. 2012) ("courts have identified several factors highly relevant to this

inquiry: first, the significance of the interference with the person's possessory interest, . . .

second, the duration of the delay, . . . third, whether or not the person consented to the seizure,

. . . and fourth, the government's legitimate interest in holding the property as evidence")

(internal citations omitted).

        In order to ensure that the issue of delay has been fully briefed, the government is

directed to file by no later than **November 19, 2014** a supplemental memorandum addressing the

issues identified above.  St. Denis may respond to the government's supplemental submission by

no later than **December 3, 2014**.


## IV.   <u>Motion to Suppress Statements</u>

        Next, I turn to St. Denis's motion to suppress statements she made on August 24,

2012, on the grounds that she did not knowingly and voluntarily waive her *Miranda* rights before

being questioned and that her statements were otherwise involuntary.[12]  (Docket ## 80 at 25-26;

80-4 at ¶¶ 9-10).

---

[12]  In her moving papers, St. Denis invoked the Sixth Amendment right to counsel as a legal basis to
warrant suppression of her statements.  At the time of the challenged statements, however, St. Denis's Sixth
Amendment right to counsel had not attached.  *See Rothgery v. Gillespie Cnty., Tex.*, 554 U.S. 191, 198 (2008)
(Sixth Amendment right to counsel attaches at the commencement of prosecution which includes "the initiation of
adversary judicial criminal proceedings – whether by way of formal charge, preliminary hearing, indictment,
information, or arraignment") (internal quotation omitted); *United States v. Moore*, 670 F.3d 222, 234 (2d Cir.)
("[i]f, as true at the time of [defendant's] questioning here, no formal charging instrument has yet been filed, the

Statements made during custodial interrogation are generally inadmissible unless a suspect first has been advised of her rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966). In *Miranda*, the Supreme Court held that the prosecution may not use a defendant's statements that are the product of custodial interrogation unless it demonstrates that the defendant was first warned of her Fifth Amendment privilege against self-incrimination and then voluntarily waived that right. *Miranda v. Arizona*, 384 U.S. at 444. Accordingly, "[e]ven absent the accused's invocation of [her rights], the accused's statement during a custodial interrogation is inadmissible at trial unless the prosecution can establish that the accused in fact knowingly and voluntarily waived [*Miranda*] rights when making the statement." *United States v. Plugh*, 648 F.3d 118, 127 (2d Cir. 2011) (alteration in original) (quoting *Berghuis v. Thompkins*, 560 U.S. 370, 382 (2010)), *cert. denied*, 132 S. Ct. 1610 (2012). To establish a valid waiver, the government must prove by a preponderance of the evidence that (1) the waiver was "knowing" – namely, that it was "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it," and (2) it was "voluntary" – namely, "that it was the product of a free and deliberate choice rather than intimidation, coercion or deception." *Id.* at 382-83 (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)).

In examining whether a statement was made voluntarily, a court must consider the totality of the circumstances in which it was given "to determine whether the government agents' conduct 'was such as to overbear [a defendant's] will to resist and bring about [statements] not freely self-determined.'" *United States v. Kaba*, 999 F.2d 47, 51 (2d Cir.) (quoting *United States v. Guarno*, 819 F.2d 28, 30 (2d Cir. 1987) (citations omitted)), *cert. denied*, 510 U.S. 1003 (1993). In evaluating the totality of the circumstances, the court must assess: "(1) the

---

[Sixth Amendment] right to counsel generally attaches at the first appearance [by the accused] before a judicial officer at which a defendant is told of the formal accusation against him and restrictions are imposed on his liberty") (internal quotation omitted), *cert. denied*, 133 S. Ct. 48 (2012).

characteristics of the accused, (2) the conditions of the interrogation, and (3) the conduct of law enforcement officials." *United States v. Awan*, 384 F. App'x 9, 14 (2d Cir. 2010) (quoting *Green v. Scully*, 850 F.2d 894, 901-02 (2d Cir.), *cert. denied*, 488 U.S. 945 (1988)), *cert. denied*, 131 S. Ct. 969 (2011).  Where circumstances suggest evidence of "brutality, [p]sychological duress, threats, [or] unduly prolonged interrogation," statements will be deemed involuntary.  *United States v. Moore*, 670 F.3d 222, 233 (2d Cir.) (alteration in original) (quoting *United States v. Verdugo*, 617 F.3d 565, 575 (1st Cir. 2010), *cert. denied*, 131 S. Ct. 954 (2011)), *cert. denied*, 133 S. Ct. 48 (2012).

Here, the government does not contest that St. Denis was in custody at the time that she made the statements in question.  Rather, the question is whether St. Denis was advised of and validly waived her *Miranda* rights prior to providing the statements.  On the record before me, principally the credible testimony of Tucker, I find that St. Denis was properly advised of her *Miranda* rights and voluntarily waived them before speaking to the investigators.  Specifically, Tucker testified that after the officers entered the hotel room and arrested St. Denis, she was permitted to get dressed and was seated at a table.  Tucker testified that he read the *Miranda* rights verbatim from a rights card and asked St. Denis whether she understood them and whether she would talk to him.  St. Denis responded affirmatively to both questions.  St. Denis showed no signs of intoxication or incoherence during the interview, nor did she request an attorney or that the questioning cease.  Indeed, Tucker testified that St. Denis was both cooperative and talkative during the interview, which was conducted primarily by Tucker.  I further find that Tucker did not make any threats or promises in order to induce St. Denis to speak.

Although the officers' entry into the hotel room may have been intimidating, those circumstances, without more, do not render St. Denis's waiver and subsequent statements involuntary. *See United States v. Henderson*, 2013 WL 5839805, *5 (W.D.N.Y.) (citing *United States v. Laidlaw*, 2010 WL 382551, *6 (D. Conn. 2010) ("[a]lthough being arrested by officers who have their weapons drawn is intimidating, 'the fact that a person is in custody or has been subjected to a display of force does not automatically preclude a finding of voluntariness'") (quoting *United States v. Snype*, 441 F.3d 119, 131 (2d Cir.), *cert. denied*, 549 U.S. 923 (2006))), *report and recommendation adopted*, 2013 WL 6191524 (W.D.N.Y. 2013). After the entry, the officers holstered their weapons, St. Denis was permitted to dress and was seated at a table in the hotel room. The interview was conducted by Tucker and Couch and was preceded by administration of *Miranda* warnings. On this record, I conclude that St. Denis's waiver of her *Miranda* rights was voluntary. *See United States v. Phillips*, 2009 WL 1918931, *2-3 (N.D. W. Va. 2009) (statement and consent were voluntary where "any guns which were drawn had been holstered well prior to the interview, the accused had been moved to a police car with only three officers present, and the surprise of the arrest had somewhat dissipated"). The fact that St. Denis may have been upset about her arrest or the seriousness of charges she faced[13] does not detract from my finding that St. Denis's waiver and subsequent statements were voluntary. *See United States v. Montgomery*, 2013 WL 6837393, *7 (W.D.N.Y. 2013) (*Miranda* waiver and subsequent statements voluntary where agent informed defendant of the charges against him, the potential sentence range and that it would be to his benefit to cooperate); *United States v. Cleveland*, 2013 WL 4759081, *10 (W.D.N.Y.) (statements voluntary where defendant displayed

---

[13] Tucker was not asked whether the potential charges were discussed with St. Denis, but did testify that he did not threaten St. Denis. In her affidavit, St. Denis asserted that she was "scared by the threats of a long prison term." (Docket # 80-4 at ¶ 10).

some emotion during interview, but otherwise was calm and eagerly spoke to investigators),
*report and recommendation adopted*, 2013 WL 6440949 (W.D.N.Y. 2013).

On this record, I conclude that St. Denis's waiver and subsequent statements to
law enforcement were voluntary, and I recommend that the district court deny St. Denis's motion
to suppress the statements she made on August 24, 2012.


### V.      <u>Motion to Suppress Photographic Identification</u>

I now turn to defendants' motions to suppress evidence of the two photographic
identifications and any in-court identification of the defendants by A.P.   (Docket ## 17, 80, 116,
117).  The government opposes the motions, contending that neither identification procedure was
unduly suggestive and that A.P. had an independently reliable basis upon which to make the
identifications.  (Docket ## 25, 81, 120).

Evidence of eyewitness identification will be suppressed under the due process
clause if a pretrial "photographic identification procedure was so impermissibly suggestive as to
give rise to a very substantial likelihood of irreparable misidentification."  *Simmons v. United
States*, 390 U.S. 377, 384 (1968).  In determining whether to exclude identification testimony, a
court must first consider whether the identification procedure was unduly suggestive.  *Id*.  If the
identification procedure was unduly suggestive, the court must proceed to determine whether the
identification nevertheless possesses "sufficient aspects of reliability."  *United States v. Bubar*,
567 F.2d 192, 197 (2d Cir.) (citing *Manson v. Brathwaite*, 432 U.S. 98, 109-17 (1977)), *cert.
denied*, 434 U.S. 872 (1977).  "Even if the procedure was unnecessarily (or impermissibly)
suggestive . . .[,] a district court may still admit the evidence 'if, when viewed in the totality of
the circumstances, it possesses sufficient indicia of reliability.'"  *United States v. Bautista*, 23

F.3d 726, 729-30 (2d Cir.) (footnote omitted) (quoting *United States v. Simmons*, 923 F.2d 934,

950 (2d Cir.), *cert. denied*, 500 U.S. 919 (1991)), *cert. denied*, 513 U.S. 862 (1994).

A.   **Suggestiveness of Identification Procedures**

I find that the identification procedures conducted on August 8, 2012 and August

20, 2012 were unduly suggestive.  During both procedures, A.P. was shown photographs of a

single individual.  "The Second Circuit 'has consistently condemned the exhibition of a single

photograph as a suggestive practice, and where no extenuating circumstances justify the

procedure, as an unnecessarily suggestive one.'"  *United States v. Reed*, 2012 WL 2053758, *5

(S.D.N.Y. 2012) (quoting *Wiggins v. Greiner*, 132 F. App'x 861, 865 (2d Cir.), *cert. denied*, 546

U.S. 986 (2005)), *aff'd*, 570 F. App'x 104 (2d Cir. 2014); *Burgess v. Conway*, 2010 WL

6841526, *12 (S.D.N.Y. 2010) ("[s]ingle-photo identification procedures are generally

considered to be impermissibly suggestive"), *report and recommendation adopted*, 2011 WL

2638141 (S.D.N.Y. 2011); *United States v. Williams*, 999 F. Supp. 412, 414 (W.D.N.Y. 1998)

("[w]here no extenuating circumstances justify the procedure, the exhibition of a single

photograph is considered unnecessarily suggestive"), *aff'd*, 192 F.3d 280 (2d Cir. 1999).

During the August 8, 2012 identification procedure, not only was A.P. shown a

single photograph of Willis, but the document containing the photograph included Willis's name,

date of birth and arrest date.  Similarly, during the August 20, 2012 procedure, A.P. was shown a

Backpage.com advertisement containing four photographs of St. Denis, two of which depicted

her face.  The document contained additional information, including phone numbers and the

name "Michelle," a name which St. Denis used when advertising prostitution services.

The government has not provided any "extenuating circumstances" justifying the

use of single photographs when conducting the identification procedures.  In fact, Tucker

explained that he used a single photograph rather than an array because he understood A.P. knew

Willis and therefore the procedure was merely "confirmatory."  Although "a witness's

familiarity with a suspect may establish that the identification should nonetheless be admitted

because it is independently reliable, a witness's familiarity with the suspect does not, as a general

matter, establish that a single-photo display is permissible."  *United States v. Reed*, 2012 WL

2053758 at *5.  Accordingly, I find that both identification procedures were unduly suggestive.

### B.      Independent Reliability

The government maintains that even if the procedures were unduly suggestive, the

identification evidence is nonetheless admissible because A.P. had an independently reliable

basis upon which to identify Willis and St. Denis.  Defendants disagree, arguing that A.P.'s

testimony is so lacking in credibility that the Court must conclude that A.P.'s identifications are

unreliable.  (Docket ## 116 at 4-6; 117 at 4-7).

As discussed above, a defendant has the right not to be subjected to an

identification procedure that creates a "very substantial likelihood of irreparable

misidentification."  *Manson v. Brathwaite*, 432 U.S. at 116 (quoting *Simmons v. United States*,

390 U.S. at 384).  Having concluded that the identification procedures were unduly suggestive,

this Court now addresses "whether the identification was independently reliable, *see Manson*,

432 U.S. at 109-114, or whether there was a very substantial likelihood of misidentification."

*Neal v. Kuhlmann*, 1988 WL 13781, *6 (S.D.N.Y. 1988) (citing *Neil v. Biggers*, 409 U.S. 188,

198 (1972)).  In doing so, the Court considers the factors articulated in *Neil v. Biggers*, 409 U.S.

at 199.  Those factors include "the opportunity of the witness to view the [defendant] at the time

of the [contact], the witness' degree of attention, the accuracy of the witness' prior description of

the [defendant], the level of certainty demonstrated by the witness [during the identification], and the length of time between the [contact] and the [identification]." *Id.* at 199-200.

Defendants maintain that the Court should not credit any of A.P.'s testimony, thus preventing the government from establishing that A.P.'s identification has an independently reliable basis. In essence, defendants request that the Court find A.P. incredible as a matter of law. A thorough review of A.P.'s testimony reveals numerous bases upon which her credibility may properly be challenged. First, she has testified inconsistently on numerous issues; second, she has a professed ability to remember events and details when questioned by the prosecutor and inability to remember some of the same events and details when questioned by defense counsel; third, she has admitted to having previously provided a false identification to the police resulting in the arrest of an innocent individual and perjured identification testimony; and, fourth, she has admitted that during the time period relevant to this case she was frequently under the influence of various drugs and was sometimes intoxicated to the point of blacking out and losing her memory.

Despite my misgivings about A.P.'s credibility on many issues, I am constrained to conclude that the jury must be given the opportunity to assess and weigh her testimony and must be trusted to do so in accordance with the instructions the district judge will provide. Generally, unless there is a "very substantial likelihood of irreparable misidentification," challenges to the credibility of identification testimony are for the jury, not the Court. *Manson*, 432 U.S. at 116 ("[w]e are content to rely upon the good sense and judgment of American juries, for evidence with some element of untrustworthiness is customary grist for the jury mill"); *United States v. Lemos*, 2013 WL 149646, *1 (E.D.N.Y. 2013) ("[a]s a general rule, identification testimony is for the jury to weigh unless there is a very substantial likelihood of

irreparable misidentification") (internal quotations omitted).  As the Supreme Court has recognized, "[j]uries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature."  *Manson*, 432 U.S. at 116.

In this case, although A.P.'s credibility is open to serious challenge considering her inconsistent testimony, history of false identification and perjured testimony, and admitted serious drug use, I conclude that those issues affect the weight, not admissibility, of her identification testimony.  *See United States v. Allen*, 930 F.2d 1270, 1273 (7th Cir. 1991) (trial court properly admitted witness's identification testimony despite witness's previous misidentification; "[n]o one stood in any better position to judge the credibility of the witness than the jury who heard and saw her change her testimony"); *Burgess v. Conway*, 2010 WL 6841526 at *13 (admitting identification testimony despite witness's admission that he had consumed heroin and cocaine prior to witnessing the crime); *DeChirico v. Walker*, 558 F. Supp. 2d 355, 362, 368, 370 (E.D.N.Y. 2008) (trial court did not err in admitting identification testimony despite witness's inconsistent testimony, admitted drug use and motive to fabricate testimony; "[the witness's] drug use and self-interest impact only the weight of the evidence[;] [t]hey fall short of rendering his testimony incredible as a matter of law"); *Ayala v. Ercole*, 2007 WL 1135560, *9 (E.D.N.Y. 2007) (trial court properly admitted identification testimony despite the fact that the witnesses admitted consuming alcohol or drugs on night of incident); *Gilbert v. Superintendent of Collins Corr. Facility*, 2004 WL 287683, *9 (S.D.N.Y. 2004) (same); *Monroe v. Smith*, 197 F. Supp. 2d 753, 760 (E.D. Mich. 2001) (testimony may not be suppressed on the ground that the witness committed perjury; "[t]he credibility of an in-court identification is to be resolved ultimately by the jury after the defendant has had an opportunity to test the accuracy of

an identification through cross-examination") (internal quotations omitted), *aff'd*, 41 F. App'x

730 (6th Cir. 2002).

On the critical issue of identification, A.P. testified that she met St. Denis at the

latest during the summer of 2012 and lived with St. Denis and Willis at 495 Bay Street for

approximately five days that summer.  She further testified that during that time she spent time

with St. Denis and had two sexual encounters with Willis.  Despite her inconsistent testimony on

many other topics, A.P.'s testimony was unvarying that she lived with St. Denis at 495 Bay

Street and that she had sexual encounters with Willis at that address.  Such testimony establishes

that A.P. had an independently reliable basis to identify both St. Denis and Willis, judged by the

factors outlined above.  *See United States v. Wolfish*, 525 F.2d 457, 462 (2d Cir. 1975)

(independent basis for identification existed where witness had three prior ten-minute meetings

with defendant during which defendant had made unusual requests), *cert. denied*, 423 U.S. 1059

(1976); *Robinson v. Artus*, 664 F. Supp. 2d 247, 259-60 (W.D.N.Y. 2009) (independent basis

existed where one witness had known defendant for two months prior to the crime and defendant

had been a frequent overnight guest of other witness); *United States v. Perez*, 248 F. Supp. 2d

111, 114-16 (D. Conn. 2003) (independent basis for identification existed where witness had

opportunity to observe defendant over a two-day period) (collecting cases); *United States v.*

*Alexander*, 923 F. Supp. 617, 625 (D. Vt. 1996) (identification independently reliable where

witnesses had "extensive contact" with defendants over period of several months); *United States*

*v. Shakur*, 1987 WL 5368, *1 (S.D.N.Y. 1987) (denying request for *Wade* hearing relating to

photographic identifications by witnesses who had "extensive, personal contacts with

[defendant] in both licit and illicit activities").

Further, other record evidence exists corroborating A.P.'s testimony that she lived at 495 Bay Street for some period of time and that St. Denis and Willis also lived at that address.[14]   First, another witness, CW1, told law enforcement that she and A.P.'s mother discovered that A.P. was living at the 495 Bay Street address.   (Docket # 80-5 at ¶ 6).   CW3, A.P.'s mother, told law enforcement that she successfully retrieved A.P. after an altercation at that residence.   (*Id.* at ¶ 7).   According to Tucker, St. Denis told him that she lived at 495 Bay Street, that she knew A.P. and that she had met A.P. in December 2011.   (Docket # 80-6 at ¶ 25).   In addition, Tucker reported that the Accurint database suggested that Willis was associated with the 495 Bay Street address during the summer of 2012.   (Docket # 80-3 at ¶ 10).   Finally, CW1 told law enforcement that during the altercation at 495 Bay Street, a phone was retrieved from the ground outside 495 Bay Street.   (*Id.* at ¶ 6).   Subsequently, CW3 stated that Willis called that same phone and requested that it be returned to him.   (*Id.* at ¶ 7).   Tucker stated that subpoenaed records revealed that St. Denis was the subscriber of the phone.   (*Id.* at ¶ 11).

In sum, after a careful review of A.P.'s testimony and the other evidence contained in the record, I cannot conclude that "under all of the circumstances of this case there is a very substantial likelihood of irreparable misidentification" warranting preclusion of A.P.'s identification testimony.   *See United States v. Jackson*, 509 F.2d 499, 507 (D.C. Cir. 1974) (in the absence of an "appreciable likelihood" of misidentification, inconsistencies in witness identification testimony do not warrant preclusion; "[t]he jury, fully aware of those inconsistencies and deliberating under unchallenged instructions by the judge, accepted the identification").   In reaching this conclusion, I find that A.P.'s testimony that she lived with St. Denis and Willis and knew them well enough to reliably identify them is not "so incredible

---

[14]   In a letter dated May 22, 2014, the government offered to provide further corroborating evidence, including testimony from A.P.'s mother that she observed St. Denis and A.P. together.

that no reasonable juror could believe [her]." *See United States v. Shulman*, 624 F.2d 384, 388 (2d Cir. 1980) (issues of credibility are generally within the province of jury; although the testimony of a witness "theoretically" could be so incredible that it is legally infirm, trial court properly admitted challenged testimony in light of circumstances of case and corroborating evidence); *Bonilla v. Portuondo*, 2004 WL 1782174, *4 (S.D.N.Y. 2004) ("while the concerns raised on cross-examination may have affected the weight of the evidence, they failed to rise to the level of doubt such that no juror could reasonably believe [witness's] testimony"); *Soto v. Lefevre*, 651 F. Supp. 588 (S.D.N.Y. 1986) (inconsistent testimony goes "to the credibility of the [witness's] testimony or to its weight, clearly matters for the jury to assess, but they do not render [witness's] identification of petitioner as one of the assailants incredible as a matter of law"), *aff'd*, 812 F.2d 713 (2d Cir.), *cert. denied*, 482 U.S. 907 (1987); *Brown v. Smith*, 1986 WL 2767, *6-7 (S.D.N.Y. 1986) ("[t]here is no doubt that [the inconsistent testimony] draw[s] certain aspects of [the witness's] testimony into question, but they clearly do not render [the witness's] testimony incredible as a matter of law[;] [a] rational jury could still find the bulk of [the witness's] testimony credible [and] . . . could conclude that [the witness] had sufficient opportunity to observe [the defendant] during the robbery to identify him accurately").

Accordingly, I recommend that the district court deny Willis's and St. Denis's motions to suppress the identification evidence and testimony.

## CONCLUSION

For the reasons stated above, I recommend that St. Denis's motions to suppress tangible evidence seized pursuant to the search warrants for 495 Bay Street and the Samsung Cricket phone **(Docket # 80)** and to suppress statements **(Docket # 80)** be **DENIED**.  I also

recommend, for the reasons stated above, that St. Denis's and Willis's motions to suppress identification evidence (**Docket ## 17, 80**) be **DENIED**.  The parties are directed to file supplemental memoranda regarding the seizure and retention of the cell phones in accordance with the directions set forth herein.  Oral argument on those supplemental submissions shall be held on **December 9, 2014**, **at 9:30 a.m.**

**IT IS SO ORDERED.**

_s/Marian W. Payson_
MARIAN W. PAYSON
United States Magistrate Judge

Dated: Rochester, New York
November 5, 2014

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report and Recommendation in accordance with the above statute and Rule 59(b) of the Local Rules of Criminal Procedure for the Western District of New York.[15]

The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. *See*, *e.g.*, *Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988).

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** *Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Ltd.,* 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 59(b) of the Local Rules of Criminal Procedure for the Western District of New York, "[w]ritten objections . . . shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **Failure to comply with the provisions of Rule 59(b) may result in the District Court's refusal to consider the objection.**

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the parties.

**IT IS SO ORDERED.**

_s/Marian W. Payson_
MARIAN W. PAYSON
United States Magistrate Judge

Dated: Rochester, New York
November 5, 2014

---

[15]  Counsel is advised that a new period of excludable time pursuant to 18 U.S.C. § 3161(h)(1)(D) commences with the filing of this Report and Recommendation.  Such period of excludable delay lasts only until objections to this Report and Recommendation are filed or until the fourteen days allowed for filing objections has elapsed. *United States v. Andress*, 943 F.2d 622 (6th Cir. 1991); *United States v. Long*, 900 F.2d 1270 (8th Cir. 1990).